# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00187-CR

Dudley Leon Johnson, Appellant

v.

The State of Texas, Appellee

### FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
### NO. CR-16-0597, HONORABLE GARY L. STEEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following a traffic stop, Dudley Leon Johnson was charged with possession of a controlled substance (methamphetamine) with intent to deliver. *See* Tex. Health & Safety Code §§ 481.102(6), .112(a), (d). The indictment included enhancement allegations that Johnson had previously been convicted of felony driving while intoxicated and aggravated assault with a deadly weapon.[1] *See* Tex. Penal Code § 12.42(d). After he was charged in this case, Johnson filed a motion to suppress evidence obtained during the traffic stop. The district court, after a hearing, denied the motion. Johnson then entered a guilty plea to the charged offense and a plea of true to the enhancement allegations. The district court accepted Johnson's pleas and found true the enhancement allegations. The district court sentenced Johnson to thirty years' imprisonment. In

---

[1] The indictment contained other enhancement allegations asserting that Johnson had previously been convicted of seven additional felony offenses, but the State later abandoned these additional allegations.

two issues on appeal, Johnson contends that the district court erred when it denied his motion to suppress. We will affirm the district court's judgment of conviction.

**BACKGROUND**

As set out above, Johnson was charged with possession of a controlled substance with intent to deliver after the police initiated a traffic stop of his vehicle. During a suppression hearing, Officer Patrick Aubry and Johnson testified. A recording from Officer Aubry's dashboard camera was admitted into evidence and played for the district court.

Officer Aubry testified that he has received special training regarding the investigation of drug-related offenses. Officer Aubry stated that on the night in question, he observed Johnson's vehicle at the home of Rosemary Dexter, who "was a drug dealer" and had been arrested months before for possessing methamphetamine. Moreover, Officer Aubry testified that Johnson left the house around midnight and that he followed Johnson before observing Johnson commit three traffic violations by driving while using his cell phone, by stopping past "the white" line at an intersection, and by turning right at an intersection red light with a sign prohibiting that turn.

Officer Aubry testified that he initiated a traffic stop after observing Johnson commit the traffic violations, that he asked Johnson from where he was coming, and that Johnson repeatedly provided false information regarding his prior location by stating that he had driven from a part of town different from what Officer Aubry had observed. Officer Aubry stated that, based on his training and experience, he suspected that Johnson had been involved in or was engaging in criminal activity. Officer Aubry testified that he ran Johnson's driver's license approximately two minutes after pulling Johnson over, that Johnson agreed to allow Officer Aubry to search Johnson and his

2

car around five to six minutes into the traffic stop, and that Johnson never revoked his consent. Officer Aubry testified that he called for back up, that Officer Cope arrived on the scene approximately twelve minutes after the traffic stop started, and that he began to search Johnson's car when Officer Cope arrived.

Officer Aubry testified that he found a digital scale with what he believed to be "methamphetamine residue throughout the top of the scale." Officer Aubry discussed how, after finding the scale, he asked Johnson to remove his shoes, how Johnson did not object, and how Officer Aubry found a bag of methamphetamine inside Johnson's shoes. Officer Aubry testified that he then arrested Johnson.

During cross-examination, Officer Aubry explained that he was "stak[ing] out" Dexter's home when he saw Johnson, that Officer Aubry did not see Johnson behaving suspiciously while walking to his car, and that Johnson did not try to hide anything during the traffic stop. Officer Aubry related that he could not remember if he discussed the traffic violations with Johnson again after Officer Aubry asked for Johnson's license and proof of insurance. Johnson testified that he felt intimidated by Officer Aubry when he gave his consent, but Johnson agreed that Officer Aubry did not threaten him or tell him that he had to consent.

The dashboard recording is consistent with Officer Aubry's testimony regarding his interaction with Johnson and the timing of the events in question. The recording captures Johnson turning right at a red light in an intersection with a sign prohibiting right turns on red. It shows Officer Aubry activating his emergency lights and initiating the traffic stop and documents Officer Aubry informing Johnson that he had been pulled over for making a prohibited right turn.

3

Officer Aubry asked Johnson from where he was coming and to where he was headed. Johnson repeatedly stated that he had left the home of a friend other than Dexter before being stopped. Officer Aubry asked Johnson for his driver's license and proof of insurance and transmitted that information to dispatch for a computer check. The recording depicts Officer Aubry asking Johnson to step out of the car, to which Johnson agrees. The recording shows Officer Aubry again asking Johnson where he was coming from, and Johnson repeated his earlier statements that he had just left his friend's house.

The recording documents Johnson's response to Officer Aubry's request to search Johnson's person. This exchange occurred approximately four minutes after the traffic stop was initiated. The recording shows Officer Aubry searching Johnson's pockets and wallet for approximately one minute before asking Johnson if he would consent to having his vehicle searched. The recording shows Johnson consenting to Officer Aubry searching the vehicle. Furthermore, the recording captures Officer Aubry requesting back up, searching the car after another police officer arrived, finding a scale inside the vehicle, asking Johnson to remove his shoes after the search of the vehicle was over, and discovering a bag of methamphetamine inside one of the shoes.

After hearing testimony, viewing the recording, and considering the parties' arguments, the district court denied the motion to suppress.

## GOVERNING LAW AND STANDARD OF REVIEW

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard,

the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). In general, appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *See State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see also Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and demeanor"). "The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). "When there are no written findings explaining the factual basis for the trial judge's decision, we imply findings of fact that support his ruling so long as the evidence supports those implied findings." *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011). In addition, a trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but "a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it." *Story*, 445 S.W.3d at 732.

"Routine traffic stops are analogous to investigative detentions." *Martinez v. State*, 236 S.W.3d 361, 369 (Tex. App.—Fort Worth 2007, pet. ref'd, untimely filed); *see also State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011) (describing types of interactions between

5

citizens and law-enforcement personnel). Investigative detentions are less intrusive than arrests, *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011), and an officer may initiate a traffic stop if he has reasonable suspicion that a crime is about to be committed or has been committed, *see Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014). In order for reasonable suspicion to exist, an actual violation does not need to have occurred; rather, it is only necessary that "the officer reasonably believed a violation was in progress." *Green v. State*, 93 S.W.3d 541, 545 (Tex. App.—Texarkana 2002, pet. ref'd); *see Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000) (noting that officer may briefly detain person for investigative purposes on less than probable cause where specific and articulable facts along with inferences from those facts reasonably warrant detention); *see also Derichsweiler*, 348 S.W.3d at 917 (noting that reasonable suspicion does not require information leading "inexorably to the conclusion that a particular and identifiable penal code offense is imminent" and instead only requires information suggesting "that *something* of an apparently criminal nature is brewing"). "In assessing whether the intrusion was reasonable, an objective standard is utilized: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate." *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997); *see also Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001) (explaining that "[t]his standard is an objective one: there need only be an objective basis for the stop; the subjective intent of the officer conducting the stop is irrelevant"). Moreover, the assessment is made in light of the totality of the circumstances. *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Simpson v. State*,

6

29 S.W.3d 324, 328 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Provided that the traffic stop is based on reasonable suspicion, then the detention "does not violate Texas law." *Guerra*, 432 S.W.3d at 911. "Where . . . the facts and circumstances show that the traffic stop was lawful, the subjective reasons for such detention are irrelevant." *Coleman v. State*, 188 S.W.3d 708, 717 (Tex. App.—Tyler 2005, pet. ref'd).

In addressing whether a stop was supported by reasonable suspicion, reviewing courts must consider whether the officer's actions were justified at the inception and whether the circumstances justifying the stop are "reasonably related, in scope, to the circumstances that justified the stop in the first place." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). "[T]he general rule is that an investigative stop can last no longer than necessary to effect the purpose of the stop." *Id.* For example, "if a driver is stopped on suspicion of driving while intoxicated, once the police officer determines that the driver is not impaired, he should be promptly released." *Id.* "During a traffic stop, an officer may demand identification, a valid driver's license, and proof of insurance from the driver, and may also check for outstanding warrants." *Simpson*, 29 S.W.3d at 327. Further, "an officer is entitled to request information concerning . . . the driver's destination[] and the purpose of the trip." *McQuarters v. State*, 58 S.W.3d 250, 255-56 (Tex. App.—Fort Worth 2001, pet. ref'd).

"If during a valid traffic stop and detention, the officer develops reasonable suspicion that the detainee is engaged in criminal activity, prolonged or continued detention is justified." *Haas v. State*, 172 S.W.3d 42, 52 (Tex. App.—Waco 2005, pet. ref'd); *see Powell v. State*, 5 S.W.3d 369, 377 (Tex. App.—Texarkana 1999, pet. ref'd). "In other words, once the purpose of the original

7

detention has been effectuated, any continued detention must be supported by some additional reasonable suspicion, that is, something out of the ordinary that is occurring and some indication that the unusual circumstance is related to crime." *Simpson*, 29 S.W.3d at 327. Furthermore, "an officer may request consent to search a vehicle after a traffic stop but may not detain the occupants or vehicle further if such consent is refused unless reasonable suspicion of some criminal activity exists." *Id.* at 328. A search "obtained through voluntary consent" is "constitutionally 'reasonable.'" *See Nanny v. State*, No. 03-16-00196-CR, 2016 WL 7046818, at *6 (Tex. App.—Austin Nov. 30, 2016, no pet.) (mem. op., not designated for publication) (quoting *Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010)).

## DISCUSSION

In his first issue on appeal, Johnson contends that the district court erred by denying his motion to suppress because he was improperly detained for "approximately 6-8 minutes" before Officer Aubry asked if Johnson would give his consent to have his vehicle searched. In his second issue on appeal, Johnson urges that in the event that this Court determines that his initial detention was unlawful, this Court should also conclude that "the initial seizure" was not "attenuated to the degree necessary to render [his] consent valid and secured independent of any taint stemming from his illegal seizure."

**Initial Detention**

As a preliminary matter, we note that Johnson does not dispute whether Officer Aubry had reasonable suspicion to initiate the traffic stop after having observed Johnson commit a traffic

violation. Similarly, we note that Johnson does not seem to dispute in this issue that he consented to the searches of his person and of his vehicle. Even if Johnson's brief can be construed as attacking the voluntariness of his submission to those two searches, we note that Johnson's testimony during the hearing explaining that Officer Aubry did not threaten Johnson or otherwise compel him to consent in addition to the recording and Officer Aubry's testimony regarding his interaction with Johnson would support an implied determination that Johnson consented to the two searches. *See Fernandez-Madrid v. State*, No. 03-15-00796-CR, 2017 WL 875302, at \*5 (Tex. App.—Austin Mar. 1, 2017, no pet.) (mem. op., not designated for publication) (concluding that record supported implied finding that defendant voluntarily consented to search of vehicle, in part, where recording "show[ed] that Deputy Ellison did not threaten any force against Fernandez-Madrid").[2]

Regarding the time between the traffic stop and Johnson's consent to the vehicle search, we note that testimony and the recording demonstrate that only a few minutes had passed and that Officer Aubry had inquired to and from where Johnson was driving, discussed with Johnson why he had been pulled over, and asked for Johnson's driver's license and proof of insurance. Additionally, the recording captures Officer Aubry communicating Johnson's information to dispatch. These actions were part of a routine traffic stop. The evidence shows that Johnson agreed

---

[2] In his second issue on appeal, Johnson seems to suggest that his consent to the two searches was involuntary because his consent was given after he was illegally and unreasonably detained. However, as set out more thoroughly above, we ultimately conclude that the district court would not have abused its discretion by determining either that the purpose of the initial traffic detention had not been effectuated before Johnson gave his consent to the two searches or that Johnson's continued detention beyond the purpose of the initial detention and up to the time at which he consented to the searches was supported by reasonable suspicion. Accordingly, we cannot agree with Johnson's suggestion that he only gave his consent after being illegally and unreasonably detained.

to allow Officer Aubry to search his person as part of this exchange. Nothing in the recording indicates that Officer Aubry received any response to his request to have Johnson's license checked before Johnson agreed to submit to the search. *Cf. Richardson v. State*, 494 S.W.3d 302, 304 (Tex. App.—Waco 2015, no pet.) (noting that "[i]t is only after this computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not stolen, that the traffic-stop investigation is fully resolved").

Viewing the evidence and all reasonable inferences in favor of the district court's ruling, we conclude that the record would reasonably support a determination by the district court that Johnson was not detained beyond the scope of the initial traffic stop and that any further delay was the result of Johnson's decisions to consent voluntarily to the search of his person and then shortly thereafter to consent to the search of his vehicle. *See Hamal v. State*, 390 S.W.3d 302, 307-08 (Tex. Crim. App. 2012) (noting that "[a]n officer may check a driver's criminal history so long as doing so does not unduly prolong the stop"); *Simpson*, 29 S.W.3d at 328 (observing that officer initiating traffic stop did not "receive[] the license check information" until "[a]pproximately eight minutes after the stop began"); *see also State v. Ibanez*, No. 03-10-00832-CR, 2012 WL 2742808, at *6, *7 (Tex. App.—Austin July 6, 2012, pet. ref'd) (mem. op., not designated for publication) (explaining that police "were not excused from the requirement of a reasonable suspicion to support the prolonged detention" where there was "no evidence that" defendant "consented to this additional delay").

When presenting this issue on appeal, Johnson relies primarily on *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). In that case, a police officer initiated a traffic stop of the

defendant, inquired why the defendant committed the traffic offense at issue, ran "a records check" on the defendant, issued the defendant a "written warning," returned the defendant's documents, and "got all the reason[s] for the stop out of the way" before asking the defendant for permission to have a K-9 unit walk around the car. *Id.* at 1613. After the defendant refused the officer's request, the officer instructed the defendant to turn off his car and get out of the vehicle, and a second officer performed the search, which ultimately resulted in the K-9 officer discovering methamphetamine in the car approximately "seven or eight minutes" after the written warning had been given to the defendant. *Id.*

The trial court denied the defendant's motion to suppress, and the appellate court determined that the seven- or eight-minute delay "constituted an acceptable '*de minimis* intrusion on [the defendant]'s personal liberty'" but did not address whether the officer "had reasonable suspicion to continue [the defendant]'s detention after issuing the written warning." *Id.* at 1614 (quoting *United States v. Rodriguez*, 741 F.3d 905, 908 (8th Cir. 2014), *vacated*, 135 S. Ct. 1609 (2015)). The Supreme Court explained that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures" and remanded the case to allow the appellate court to determine "whether reasonable suspicion of criminal activity justified detaining [the defendant] beyond completion of the traffic infraction investigation." *Id.* at 1612, 1616-17.

In contrast, in this case, we have concluded that the record would support determinations that Johnson was only briefly detained before voluntarily consenting to searches of his person and of his vehicle and that Johnson was not improperly delayed beyond the scope of the

11

initial traffic stop before giving his consent to those searches. Accordingly, we believe that analysis from *Rodriguez* is not applicable here.

For all of these reasons, we conclude that the district court acted within its discretion in denying Johnson's motion to suppress. We, therefore, overrule Johnson's first issue on appeal.

## Attenuation of Consent

In his second issue on appeal, Johnson urges that if this Court determines that Johnson was unlawfully detained, this Court should conclude that the motion to suppress should have been granted despite Johnson's decision to consent to the two searches because "the taint otherwise inherent in the illegality of" the unlawful detention had not dissipated before Johnson gave his consent. However, in light of our resolution of Johnson's first issue on appeal, we need not address his second issue. *See* Tex. R. App. P. 47.1.

## CONCLUSION

Having overruled Johnson's dispositive issue on appeal, we affirm the district court's judgment of conviction.

_____

Thomas J. Baker, Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed: March 15, 2019

Do Not Publish

12